This morning, we will hear argument in Case 19-177, United States Agency for Int'l Development v. the Alliance for Open Society Int'l. I note at the outset that Justice Kagan is recused in this case. Mr. Mischel? Mr. Chief Justice, and may it please the Court, 20 years ago, the HIV-AIDS pandemic was devastating the world. In response, President Bush proposed and Congress adopted the Leadership Act. Since reauthorized three times, the Act has committed nearly $80 billion to global AIDS relief, and it has worked, saving more than 17 million lives in the most successful American foreign aid effort since the Marshall Plan. The funding condition at issue here requires recipients to have a policy opposing prostitution and sex trafficking, which Congress found are coercive practices that spread HIV-AIDS and degrade women and girls. This Court held that applying that condition to respondents, domestic entities, violates the unconstitutional conditions doctrine. But respondents sought more, and the question now is whether the condition can still be applied to foreign grant recipients operating abroad. It can, for two straightforward reasons. Foreign entities lack constitutional rights, so they cannot bring an unconstitutional conditions claim, and neither can respondents, because they are not subject to the funding condition. Thanks to their victory in this course, respondents can accept and use funds without any compelled speech. To be sure, respondents can choose to affiliate with foreign entities that must comply with the policy condition, but any effect on respondents' message is now a product of their own choice, not government compulsion. Respondents' contrary view is startling. They would allow U.S. nonprofits to export constitutional rights to legally separate foreign entities abroad simply because they share similar brands. That novel theory has no basis in this Court's prior decision. It could undermine longstanding regulations of foreign speech, and it has no practical justification. For 17 years, foreign recipients have adhered to the policy condition without harming the AIDS Relief Program or respondents' speech. This Court afforded respondents all the relief they deserve. The decision below should be reversed. Counsel, one thing that I think is not clear from the record is the precise relationship between the domestic entity and its foreign affiliates. We know that there are no formal corporate ties, but that these entities share the same name, the same logo, the same brand. What would you require beyond that before attributing the speech of the foreign entity to the domestic one? Mr. Chief Justice, you're correct that the record is not particularly thorough on that issue. Despite 15 years of litigation on this matter, the District Court ultimately entered the injunction at issue here based simply on letter briefing. But our position is that the formal distinction between the two entities, the U.S. entity and the foreign entity, is all that is required to attach separate legal rights. Of course, it's important to note that respondents and the foreign entities that they claim as affiliates made the choice to be separate legal entities. That choice, of course, has certain benefits for them, such as shielding them from liability, but it also has certain burdens. Is it reasonable to insist on formal corporate ties in this context? I gather that it's undisputed that to be effective in many of the foreign countries involved here, you have to operate through a foreign entity. That the effort would not be as effective if the American entity were the one actually on the ground in the foreign country. Well, two points on that, Mr. Chief Justice. First, I think that that is not true as a uniform matter. Many of the respondents, the U.S. entities, do in fact operate in foreign countries through branch offices. And as a result of this court's prior decision, they always have a choice to operate in that way without compromising their speech in any way. They are, in other words, completely in charge of their own message while also accepting Leadership Act funds. And to take your second point, if they make the choice to operate through a foreign entity because they decide that that is more convenient or more effective, they have to accept the bitter with the sweet, to be sure, operating through a distinct legal entity, but they're not without recourse. They can, for example, explain that the policy statement being issued by the foreign entity doesn't reflect their own views. Their free speech allows them to do that. And I would note as- it does reflect their own views. They have the same name, the same logo, the same brand. And I wonder if it makes more sense to think of the foreign entity as simply another channel for the domestic entity's speech. Mr. Chief Justice, with respect, I don't think it does. And I think when that was the only option available  I can understand, of course, why the court decided the case the way it did. But now that respondents have a separate choice, in fact, the very choice that they were fighting for last time, any consequences of the choice to operate as separate entities is a result of their own decisions. And I wanted to note- Thank you. Thank you, counsel. Justice Thomas. Mr. Mischel, the respondent seems to argue that your guidelines, your affiliate guidelines, actually support their argument. What do you think of that? Justice Thomas, I don't think that they do as an initial matter. And even if they did, I think that would at most be a basis for challenging the guidelines, not the constitutionality of the statute. And to start with the first point, the guidelines of which are reproduced at pages 1A through 3A of our reply brief simply provide that an entity can affiliate with a separate entity that has a different policy on prostitution and sex trafficking if it meets certain requirements. And there are five non-exhaustive requirements spelled out there. Four of those would generally be satisfied by an entity that has legal separation. So I think it would be a rare circumstance that these regulations would ever result in the denial of funding to a foreign affiliate. And to make one related point, respondents themselves are no longer subject to the policy requirement as a result of their prior decision in this case. So if they run afoul of these regulations, which simply interpret what it means to have a policy opposing prostitution and sex trafficking, these regulations can't be a mechanism for depriving the respondents themselves of funds. When this case was here last, I seem to remember it was about the domestic organization. What has changed since it was here? There was very little talk. The only time that affiliates actually came up was as an alternative to the enforcement procedures that were being used toward the domestic organizations then. So what has changed since this case was here last? Well, Justice Thomas, you're exactly right. That was all that was at issue last time. And the only thing that has changed is that respondents have asked for broader relief. And although we fully accept the court's prior decision, we submit that respondents are simply not entitled to any further relief. As you suggest, there's nothing in this court's decision that contemplates or suggests prohibition on applying the policy requirement to foreign entities overseas. So I think the court ought to simply analyze the claim under first principles. And as I said at the outset, I think two simple principles resolve the case. Respondents themselves are not subject to a funding condition, so they can't have an unconstitutional conditions claim. And the foreign entities that are subject to the funding condition have no constitutional rights, so they can't have an unconstitutional claim either. We do think that what respondents are asking for is unjustifiably bootstrapping this court's prior decision into global relief. And we simply don't think there's any basis for that. Thank you. Justice Ginsburg. Mr. Michel, I have two questions. And the first is that the statute exempts certain non-domestic entities from the requirement to adopt an anti-prostitution policy. And those are the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, International AIDS Vaccine Initiative, and any UN agency. What is the reason for the exemption? Why are these organizations exempt and not the organizations at issue here? Justice Ginsburg, I think there are a few reasons for that. Those are, in the main, international organizations that are composed of their own separate sovereigns. And so I think it makes sense that Congress would have wanted to respect the sovereignty of the members of those organizations in a way that doesn't, of course, apply to nonprofit organizations receiving funds at issue here. The vaccine organization that you mentioned as well seems to be particularly unlikely to bring into play the considerations that motivated Congress to require the anti-prostitution and sex trafficking pledge because they're not operating in the field. They're simply doing research on vaccines. But I don't take- It seems to me that these organizations are doing the same thing. But let me ask you my second question. And it is, may a pledge taker, you're right in these foreign entities have to take the pledge. May they nonetheless work with prostitutes to encourage the prostitutes to take preventative measures that will advance control of AIDS? The answer to that question- Can they do that? Can they take- They say, all right, we'll take the pledge, but we're going to work with prostitutes. Make sure that they use preventative devices. Absolutely they can, Justice Ginsburg. And we encourage that. That goes back to a point I was going to make earlier, which is the pledge that's required by the statute only requires one affirmative speech act. And that is submitting to USAID with the grant agreement, a policy opposing prostitution and sex trafficking. But there's no requirement that foreign entities that make that pledge shout it from the mountaintops or get into anybody's face about it. They are completely free to and encouraged to work with prostitutes and victims of sex trafficking to prevent HIV AIDS. And indeed, one of the reasons for including this requirement in the statute and many other provisions of the statute dealing with prostitution and sex trafficking is that Congress recognized that women who are often coerced into those practices are at themselves at heightened risks of contracting the disease, of spreading the disease, and of course of losing other opportunities in their lives. So we certainly encourage groups to do that kind of work. And it's not at all in tension with the policy requirement. I would also note the amicus brief filed in this court's case last time by the Coalition Against Trafficking in Women, which made the point that many prostitutes and victims of sex trafficking are themselves opposed to prostitution and sex trafficking. And so it wouldn't take offense at the statement that the groups have to make. But in any event... Justice Breyer? Just following up on that question, some would. Some would take offense. And it's in the last case, you said that this court said, this organization, which takes money for the government and uses it to fight AIDS, goes to prostitutes as part of their effort and says, use safety. And that's one way of helping to fight AIDS. And if at the same time they have to say, we're against prostitution, we don't like it, we're against it, it's terrible. Well, the prostitutes will think they're hypocrites or maybe worse and will be suspicious. That was their reasoning last time. Now, how does that change one iota in terms of their rights, which we said they have, the major organizations in the United States have the right to do? How does that change one iota? If instead of sending their own worker there, they give the money to a foreign worker in India who is associated with them. And that foreign worker goes and she says exactly the same thing to the prostitutes. Since the foreign workers are identified by name, mission, logo with the domestic workers, how does it interfere one whit less? If we accept your argument, they will be seen domestic as well as the foreign ones as hypocrites or worse interfering with their mission. If we accepted that argument before, why don't we accept it now? So a couple of quick responses, Justice Breyer. I don't think that the court did base its prior decision on that particular concern. I think it based its decision on the first amendment rights of the US entities that were receiving the funds. And so the principal difference between the case last time and the case this time is not that the entities are interacting with prostitutes in any different manner. It's that the entities that are now subject to the funding condition lacks constitutional rights under the deeply established principles that foreign entities abroad don't exercise constitutional rights and therefore can be subject to greater speech restrictions than US entities at home. Now I do, I wanna reiterate that I think the concerns you have raised while legitimate are not borne out in practice because the policy requirement, whether applied in the past to domestic groups or now to foreign groups does not require them to tell prostitutes that they oppose prostitution or to do anything affirmative beyond agreeing to be opposed to prostitution and sex trafficking in the letter. And we're fortunate to have a 17 year track record to look at here. The foreign entities have from the very beginning and even recently under stays of the district court's injunction in this phase of the litigation been subject to the policy requirement throughout that period. And as Judge Straub noted in his dissent below, they have not identified even one example of anybody perceiving hypocrisy in their message or of setting back their work to fight HIV AIDS, which of course has been historic. Thank you counsel. Justice Alito. Counsel, as I understand the government's position, it depends on whether the foreign entity that ultimately gets the leadership act funds is a separate legal entity or legally distinct from the U.S. entity, is that correct? Yeah, it depends. What we look at is whether the recipient of the funds, the entity subject to the condition has first amendment rights or not. And we think that turns on whether they're a U.S. entity or a foreign entity. All right, so what do you understand to be the meaning of legally separate or legally distinct? And how would that apply where the U.S. entity is a nonprofit corporation, a trust or an unincorporated association, if there are any of those and in the situation where the foreign entity is organized in one of those ways? So the sort of difficult questions about how to parse incorporation have really not arisen in this case, because I think respondents and the foreign entities at issue are clearly legally separate in the way that matters for the funding program, which is to say they've applied separately for different grants. And so the easiest way to answer the question, I think, is that when a U.S. entity applies for a grant as its own entity, it's not subject to the policy requirement. When a foreign entity applies for a separate grant, distinct from any affiliation it might have with a U.S. entity, then it is subject to the policy requirement. The U.S. entity gets the money and the U.S. entity wants to make a subgrant to a foreign entity. And as I understood your position, whether or not the foreign entity can be required to endorse the policy depends on whether it's legally distinct from the U.S. entity, is that correct? That is correct. So in that subgrant relationship, the condition would then attach to the foreign entity as the subgrantee of the U.S. entity. All right, well, so if the U.S. entity is a trust, how would we determine what is legally separate from, what foreign entity is legally separate from a trust, a U.S. trust? I have to confess, Justice Alito, we haven't confronted the trust question, so I don't have a ready answer for that. I think that in the 17-year history of the program, though, that there really hasn't been any difficulty in telling apart foreign organizations from domestic organizations. We're happy to take a further look at the trust hypothetical, but it's one that just hasn't arisen. Well, is that because until recently, the government's test was not legal separate, was not whether it was a legally separate entity, but a multi-factor test under the regulation to which Justice Thomas referred? No, with respect, Justice Alito, that's not, and hasn't been our position. From the outset, the government has applied the policy requirement to foreign entities abroad, and it turns out, as a result of injunctions, for almost an entire period, the government has not applied the policy requirement to domestic entities. The regulation is- Justice Sotomayor? Justice Sotomayor? I am sorry, Chief. Did it again. Mr. Michel, the long and the short of this is that a domestic agency that does not want to adopt a policy of being opposed to abortion, but who is willing to not support it in a program, they can't receive funds unless they affiliate with someone who will make the statement for them, correct? I don't think so, Justice Sotomayor. A U.S. entity that opposes prostitution and sex trafficking, which is the only requirement at issue in this case, can still receive funds as a result of this court's prior decision, and they can use those funds abroad without contracting or otherwise working through affiliates. But the domestic corporation who doesn't want to speak the government's message but does want to do the program can't unless it finds an affiliate who will speak the government's message. With respect, Justice Sotomayor, I think that was the issue in the case last time, but that's no longer true. Exactly. And the last time when you sought cert before us, you said it was tantamount or amounting to a facial challenge. If we read our prior decision as basically facially addressing the restriction, do you win? I think if you read it as truly facially invalidating the statute, then, no, we couldn't win. All right. May I move on to another question? In Hobby Lobby, we recognize that a closely held corporation at least could be viewed as expressing the religious beliefs of its owner, a person independent legally. In Hurley, we said that parade organizers could be identified by the people who marched in their parade. And similarly, in Reagan, we said that an entity could speak through an affiliate who would be recognized as itself because it could then do lobbying that Reagan couldn't do under the government program. So these cases seem to suggest to me that at least in the First Amendment context, let's put aside any other context, but in the First Amendment context, we are less concerned with corporate formalities than we are with imputation or perception. And to the extent that these corporations are closely affiliated and presuming, I know you said before that you don't think there's enough in the record. We can deal with that separately. But presuming that the public does perceive these entities as one, then why wouldn't the First Amendment apply to the inability of the domestic corporations to receive funds and partner with a closely affiliated foreign entity in implementing the program? Justice Sotomayor, a couple of points. I think Hurley and some of the other cases you cited all depend on the predicate of a forced affiliation between the two groups. And Hurley, it was the parade organizers and the group that wanted to join the parade. Here, however, and this is a response, I think, to the last part of your question, no one is forcing the domestic entity to affiliate with a foreign entity. The domestic entity has a choice to take the money and use it itself. And any hypocrisy or disturbance to its message that results is a result of its own choice to affiliate with a group, a foreign entity that accepts leadership-backed funds and must make the statement. So they're simply not being forced to affiliate with anyone in the way that was at issue in those cases you cited. Thank you, Counsel. Justice Gorsuch? Counsel, I'd like to just follow up on that for a moment. You seem to rely pretty heavily on legal separation. But the First Amendment, it's not clear to me why that cares, as opposed to imputation in Hurley, as Justice Sotomayor pointed out. Can you speak to that a little bit further for me, please? Sure. I think that the critical point, as I said, the reason to follow corporate separation here is that that's how the grant program is organized. And this court, you're right, in Hurley, where there was a forced association, the court held that attribution matters. But in every one of the court's funding condition cases, the court has looked to the effect on the recipient of the funds itself. And here, respondents and the foreign entities are making a conscious choice to apply for separate grants as separate entities and to be subject to separate conditions. I think the argument goes a little bit beyond the forced nature of the association to the concern about chilling speech. Can you speak to that? First Amendment doesn't care just about protecting speech. It also is concerned about avoiding chilling of speech. I think you're, of course, right about that. But I simply don't see any chilling of speech here, given that as a result of this court's prior decision, the domestic entities are free to take the money and use it themselves in charge of their own message. And they're also free to make a different choice, which is to work through a foreign affiliate that, as a result of a respondent's own choice, will have to make the policy statement opposing prostitution and sex trafficking. But even in that instance, respondents are still free to use their own speech rights to explain that they don't share the views of the foreign affiliate on prostitution and sex trafficking. I think ultimately what respondents are asking for is a sort of right to optimal message management, which is simply not what the First Amendment protects. If you look at cases like Rumsfeld versus Fair, the court explained that the law schools in that case might well be concerned about misattribution of their position on letting military recruiters onto campus, and yet that concern alone was not a reason to find an unconstitutional conditions violation. And likewise, in the court's other funding cases, like Rust, for example, and Regan, the entities were ultimately not allowed to operate in their preferred manner. The abortion providers, for instance, in Rust, it certainly didn't want to have to separate their speech in the way that they did, but the court found that it was constitutionally permissible for Congress and the executive branch to require them to separate that speech because they still had an open channel to express their First Amendment views. And after this court's prior decision, respondents clearly have an open channel to express their views without shilling and without having to give up the money. Thank you. Thank you, counsel. Justice Kavanaugh. Thank you, Chief Justice. Good morning, Mr. Michel. I'm interested in the implications of our decision in this case, and in particular, if the government were to lose this case, would any other programs or statutes be invalidated or called into question by such a decision? Well, Justice Kavanaugh, I think that there would be real concerns about that. Of course, I'm not here to give up any other statutes, but I do think the gravamen of respondents' position is that they and their foreign entities that they've chosen to keep separate should somehow be treated as some kind of single global unified entity. And if that is the theory that they're operating under, I do think it would call into question a number of different statutory and administrative regulations of foreign speech that likely couldn't be applied domestically. For example, Congress has long banned campaign contributions in U.S. elections by foreign entities, but Congress, of course, could not ban such contributions by U.S. entities. Yet, if a U.S. entity were able to say that it shares or confers on a foreign affiliate its First Amendment rights, it might well claim a basis for challenging that ban on foreign speech. And there are many other examples that we cite in our brief as well. It's, in fact, commonplace for Congress and the executive branch to condition foreign aid to entities abroad on certain policy objectives, such as opposing terrorism or supporting women's rights or opposing apartheid or, in the case of the Mexico City policy, taking certain positions on abortion. And those content-based, viewpoint-based speech restrictions might not be permissible in the United States, and domestic entities who were able to confer or, you know, unite with their foreign bodies, foreign entities to challenge those, would, I think, create considerable risk of disturbing long-settled laws. One other question. Has the program, with respect to U.S. domestic organizations, suffered any problems or been any less successful since this court's decision in 2013, as far as you're aware? Not at all. The program, with respect to both domestic and foreign recipients of funds, has, as I said at the outset, truly been one of the historic successes in, you know, in the history of U.S. foreign aid. And I think, you know, we do have, sort of, the controlled experiment over the last 15 years as a result of injunctions in the first case and stays of the injunction in this case, that the current status quo, whereby U.S. entities are not subject to the policy requirement, but foreign entities are subject to the policy requirement, has been the background law in place for about 15 years. And that has neither set back the extraordinary success of the program, nor created, as Judge Straub noted in his powerful dissent, any actual evidence of hypocrisy or confusion of message for respondents themselves. Mr. Mischel, take a minute to wrap up, please. Thank you, Mr. Chief Justice. I do think this case, ultimately, in its current iteration, can be resolved on a straightforward basis that respondents themselves long accepted, and that's that the policy condition is a permissible exercise of Congress's core spending power as applied to foreign recipients that lack First Amendment rights, but not as to domestic recipients that have First Amendment rights. And although respondents have broadened their position, they had it right the first time, and nothing supports the bootstrapping that they've requested. Thank you, counsel. Mr. Boker? Mr. Chief Justice, and may it please the Court. The undisputed record shows that the U.S. respondents themselves suffer First Amendment harms when the policy requirement is imposed on their foreign affiliates. Respondents and their affiliates share a name, brand, logo, mission, and voice. They speak as one, make speech and policy decisions together, and are indistinguishable to the public. As a result, the First Amendment rights of U.S. respondents are violated here in two ways. First, by a speech compulsion that is attributed to them. When CARE in Kenya takes the pledge, its affirmation of belief is attributed to CARE in the United States, thus putting words in the mouth of the U.S. entity. The second violation is from a speech restriction under regulations that prohibit any CARE entity from contradicting the pledge, even on its own time and dime, thus making it impossible for CARE U.S. to disavow CARE Kenya's pledge without engaging in doublespeak and losing U.S. funding for its global network. The government says the burden is on respondents to avoid such harms by applying for funding themselves, severing their connections to affiliates or disavowing the pledge. But this has it backward. When a statute violates the First Amendment, the burden is on the government, not the speaker, to give First Amendment freedoms the necessary breathing space. Plus, the government's proposals all fail in practice. Asking respondents to apply for funds ignores that they must work through local affiliates in places where local laws or the U.S. government's own funding criteria require it. Severing ties with affiliates would destroy their organization. Posing such a choice demonstrates how the government continues to use its vast spending power to coerce respondents' fealty. Disclaimers also fail because, as this court recognized in 2013, U.S. respondents cannot credibly disavow the speech of their own clearly identified affiliates. The injunction affords respondents complete relief from these violations and should be upheld. Counsel, can your client compel what the foreign affiliates say on this question? We represent several different organizations here, as Your Honor knows. And I think it is correct as a factual matter that, in every case, the U.S. organization effectively can veto the speech of a foreign organization on these issues. They do speak together. They make their speech choices together. But the U.S. entities here, as a practical matter, typically control that speech. Can you give me a citation of the record where I can look to find that? Because I thought that by saying that there wasn't a formal affiliation, but the organizations share the logo and the name and so forth, that there was some absence of control. And, in fact, that's what the foreign governments, for example, were insisting on. I think Your Honor is correct that there is, as a legal matter, there may be the absence of control in some cases. But in every case, there is practical control. I think the best citations to the record would be for care would be at JA389, which talks about how the care entity speaks with a single global voice. And then, I think, importantly, JA436 through 445, which discusses Care U.S.'s ownership of the brand and licenses on the brand, which is, in that case, legal control to dictate what occurs under that brand. Thank you for that, Counsel. You used the phrase practical control, and I just wonder precisely what your test for that would be. I think the right test here is the risk of attribution. As this Court recognized in 2013, there can be a risk of attribution across corporate lines where the entities in question are so clearly identified as they are here. I think the practical control point is even stronger when those entities speak together with one voice and make their speech and policy decisions together. Thank you, Counsel. Justice Thomas? Ah, yes, thank you, Chief Justice. The, did you have an opportunity in the lower courts to discuss or debate what criteria would be used to determine whether or not the two organizations merge or are close, affiliated closely enough so that the First Amendment rights apply domestically? We did, Your Honor. Judge Marrero gave the parties an opportunity to both submit voluminous materials into the record and to explain to him the relationship between these entities. I think here what's important is there is no dispute about the relationships here. These entities are clearly identified with one another. There's no dispute that they share a name, brand, logo, mission, and voice. And I think critically here, there was a two-year period where we worked hard to try to settle this case with the government. We provided extensive factual information to the government during that period. We also provided lists of the entities involved, and we offered to stipulate to a definition, and the government rejected that effort by us. But we did make a full effort in the district court and then separately with the government to come to terms on this issue. Well, if you went that far, could you give us just, give us a recap of what the criteria would be for that affiliation that would be close enough? Yeah, absolutely. I think here the test should be organizations that are part of a global network that share names, brands, logos, missions, and voices. And I think the reason that that's the right test is because we're talking about attribution by the reasonable observer, as this court has recognized in a long line of cases that Justice Sotomayor mentioned and that Justices Alito and Breyer previously discussed, a long line of cases recognize that there can be attribution across corporate lines, especially with tightly knit international organizations like these. I understand that. So the one final question, and I know you've covered this, but it'd be helpful if you would give us a recap of what precisely you think your injury is. Well, I think the types of injuries are twofold. The first injury is the compulsion of speech. And the problem here is that even though the pledge is being imposed on our foreign affiliate, those words are effectively put into the mouths of the US respondents because of the attribution problem. And the government says, well, it's no harm to the US organizations because of course they can remain neutral. But that's not right. Once those words are put into the mouths of the US respondents, that policy position is attributed to them and the harm is done from that compelled speech. The second category of harms comes from the speech restrictions imposed by the regulations. What those say is the foreign affiliate will lose its funding unless it maintains adequate separation from organizations that say or do anything inconsistent with the policy. So when the government says that the US organization can disavow the pledge, that comes at a high price, which is the loss of funding for the foreign affiliate. And so the categories of injuries are twofold. One from the speech compulsion and the other from the speech restriction. It's a catch-22 for these US organizations. Thank you, counsel. Justice Ginsburg. Counsel, I don't follow your last response because the domestic organization is able to speak for itself. And as far as any attribution of the foreign entity to the domestic organization, AOSI can disclaim the foreign entity's pledge. It says, we don't take the pledge and we disclaim any connection to the pledge that's made by a foreign entity. It's not our pledge. So they can say, and they say, that pledge by taken by the foreign entity was the price for receiving US dollars. The foreign organizations continue to work with prostitutes. They have just made a statement that on the ground means nothing. Justice Ginsburg, I think this court had it exactly right in 2013 when it recognized that an organization cannot both avow the government's viewpoint and then turn around and assert a contrary belief or even claim neutrality without appearing hypocritical and without appearing to engage in double speak. And the problem here, of course, is that the entities are indistinguishable and they speak as one. And so focusing on the corporate difference is a mistake. After all, it would be odd that the international operating arms of these US organizations are treated differently based on whether they operate through branch offices or through separate corporations. And in fact, what is wrong with the government's view that this is all by choice is that there are certain jurisdictions where local law and even the US government's own funding criteria require these US respondents to work through local affiliates. And so we're caught unable to disavow, credibly disavow the speech of an entity that looks just like our clients and speaks as one with our clients. Let me ask you a question, an argument that you didn't make. You concede that a foreign entity has no First Amendment rights. But what about the First Amendment obligations of the US government? For example, we can say the Eighth Amendment doesn't apply abroad, but does that mean that a US government official operating abroad is free to torture people? Justice Ginsburg, I think it's an... Sorry, I'm sorry for interrupting. And I'm asking whether US actors have an obligation to conform their conduct to constitutional norms. The first response is I don't want the court to think that we're trying to export the First Amendment. That's not what we're trying to do. We're just trying to afford complete relief to US organizations that have First Amendment rights here. But to your honor's good question, I think in a system with a limited government and a constitution that includes the Bill of Rights, I think there is a fair question about the extent to which the US government can go beyond what it's authorized to do in the constitution with respect to speech. I guess the other point I would add is that even these clearly identified affiliates overseas, I think the government would concede have First Amendment rights when they act here in the United States, as they often do when they come here for meetings or to publish papers or to participate in conferences. And the problem with the pledge requirement, of course, is that it binds these organizations forever and for all purposes. Thank you, counsel. Yes. Justice Breyer. It seems to me the government is prepared to concede that you, the CARE USA, doesn't have to oppose prostitution. But they say the First Amendment doesn't prevent them from telling CARE India that it has to oppose. So why don't you simply write a grant to get all the money yourself, and then you give it to CARE India? Why doesn't that work? The problem with that, Your Honor, is that according to the government, the policy requirement still binds the US organization in the following way. If CARE US gets the money and subgrants to CARE India, it must carry the burden of the government in the sense of imposing the policy requirement on its own affiliate and police compliance with the policy requirement, not just with respect to the speech and activities of its foreign affiliate, but also with respect to itself, lest it violate the regulations which- Where do I find in the briefs or in the record just what you said? Because it seems to me just what you said shows that this case is 100% about the rights of an American company, the parent. And the question is, can they forbid, can the government require them to forbid one channel of communicating the message? Can it control what they say in that channel? The channel happens to be a channel that goes abroad. I don't know that there's any precedence for the past, but precedent that says they can. I mean, if I got that right, is that clear? Yes, I think the best citations in the record, Justice Breyer, would be the regulations themselves, JA 248 to 265. And I would direct your honor's attention to the discussion, the commentary of 45 CFR 89.3. And that's at JA 256 through JA 258, where the government makes very clear that not only do funding recipients have to demonstrate their separation from entities that speak inconsistently, but they even go so far as to say there has to be separation from entities that do not have a policy themselves, suggesting that the government's view is that the US respondent itself should have a policy. I also think another place to look in the record is at JA 375 and 390, where the Pathfinder Organization talks about US funding criteria that require them to work through local affiliates and locally incorporated entities. Thank you. Thank you. Justice Alito. I agreed with your client's position when this case was before us previously, but what concerns me today is not so much the immediate impact of a decision in your favor, but where it would lead. So let me ask, because I am concerned that it will force Congress either to withhold foreign aid entirely or to allow foreign aid to be used in ways that are contrary to the interests of the people of this country. So let me give you this example. Excuse me. Suppose that the United States provides grants to domestic entities and allows them, excuse me, to make subgrants to foreign schools for the purpose of promoting education in countries with weak educational systems. And suppose that Congress specifies that any foreign entity that gets a subgrant must have a policy denouncing terrorist attacks against American civilians. Would that be unconstitutional? No, it wouldn't be, Your Honor, because that requirement doesn't require the affirmation of a belief and then conformity with that belief and espousing it as one's own. And that's, this requirement- Well, it doesn't really. The school that gets the money must have a policy denouncing terrorist attacks against American civilians. It's compelled to speak. It doesn't want to make that speech. It is affiliated with an American entity. Why isn't the argument exactly the same in that situation? I think that there's a problem with germaneness in that case. The requirement there wouldn't be related to the federal program. But to Your Honor's, I think, larger question, this doesn't turn on the particular ideology. I think any ideological commitment, any requirement of an ideological commitment by grantees is problematic for the same reasons as the one here. Yeah, that's exactly right. Let me ask you one more question before my time expires. Why doesn't the logic of your argument apply to the provision of funds to totally independent foreign entities? So suppose the US entity gets money under the Leadership Act, wants to make a subgrant to a non-affiliated foreign entity, but it can't do it unless the foreign entity makes it, unless the US entity tells the foreign entity, you cannot use, you must have a policy opposing prostitution. The US entity is compelled to make a statement that it doesn't want to make. Why doesn't the logic of your argument apply there? Well, in that case, the entity being made to take the pledge is not clearly identified with the US entity. And therefore, the pledge of the foreign entity doesn't get attributed back to the US entity. And I think that's a very important difference. Here, when the US entity imposes the requirement on its subgrantee, on its clearly identified foreign affiliate, it's as if it's imposing the pledge requirement on itself, because after all, these organizations are indistinguishable and speak with one voice. I do think it's important to make the point that the government still has very broad authority to control what happens with its funds, to put in place policies for its programs, and to require that grantees fulfill the requirements of the program in every respect. This particular requirement is unique. There's no other requirement like it in US law. And I think a decision for respondents can be very narrow, turning on the facts of this case and the prior ruling of this court, which declared the policy requirement unconstitutional. Thank you, counsel. Justice Sotomayor? Counsel, there has been a long history to this case. I'm not quite sure what the relationship is of your clients to the agency now. Are your clients grant recipients who currently receive grants, who currently work through their foreign affiliates, and their foreign affiliates have not taken this pledge, or have they not received grants and want to work with their foreign affiliates? I'm not quite sure what the status is of what the government's been doing or not doing. So, these organizations are the same organizations that were before the court in 2013, but a smaller group, because the rest of the clients are too small to have global networks. We now are talking about the entities that were before the court in 2013 that are the large international entities, like CARE and Save the Children and World Vision and Pathfinder, that are the ones with their own clearly identified affiliates overseas. And these organizations receive money here in the United States and receive money through their locally incorporated affiliates. CARE, which is the example we've been using, the U.S. entity receives all U.S. grant money under this program and then subgrants to its local affiliates. And so, in the case of CARE, it has done that under objection. It asserts that it should be free of this policy requirement. It believed that the litigation in 2013 would have disposed of this issue, and it continues to suffer these First Amendment harms and violations that we've been discussing today. I'm not sure you've answered my question. They are receiving the funds. Are they subcontracting with affiliates or partnering with affiliates? And are the affiliates making the pledge and they're complaining about the fact that they're forced to do that? Or have they not been policing the foreign affiliates and the government's now threatening to take away the funding? Well, it's a little bit of both, Your Honor. Let me explain. They are receiving the funds, and they are imposing the pledge requirement under objection on their clearly identified foreign affiliates overseas. The government has said that all these years there's been no objection to this practice. I don't think that's exactly right with respect to my friend. In fact, early in the litigation, there was a disagreement in the district court about the proper scope of the injunctive relief, and the respondents wanted broader relief to include subgrantees, and the government objected on the ground that those facts were not yet known. And the facts now are known. That was fully 12 years ago. The facts are known. The record is developed. The district court entered its findings, and I think there's no dispute about the nature of the relationship now. And so are they threatening to take away the funding? Why? They are now saying that the policy requirement will be enforced as against the clearly identified foreign affiliates of the U.S. respondents because they say those organizations have no First Amendment rights. We argue that this isn't about any rights of the foreign organizations. It's about the First Amendment rights. I'm sorry for interrupting, but if the foreign affiliates have made the policy statement, what... So they've done what the government wants. Why would the government take the funding away from you or them? We object to that policy requirement. We don't want to have to impose it on our clearly identified affiliates, and it's causing the U.S. respondents to have to engage in doublespeak. And if they do that, if they attempt to disavow that pledge, which is attributed to them, they will lose their funding for the global network. Thank you, Counsel. Justice Gorsuch? Counsel, in response to Justice Ginsburg and Justice Thomas, you indicated that the primary harm your client had suffered is the risk of attribution, mistaken attribution of the foreign affiliate's speech to the domestic entity. That sounds a bit like an alter-ego argument, that the ordinary listener will be confused and attribute the speech of a foreign affiliate to the domestic entity. Yet at the same time, I assume you'd resist any effort to pierce the corporate veil from those foreign entities and impose liability on the domestic entity. So in what respect is it, and when should we, attribute speech or actions of the foreign affiliates to the domestic entity? Why would we pierce the corporate veil sometimes, but not all the time? Your Honor, we don't ask the court to pierce the veil or to treat these entities as alter-egos. Rather, we're focused on the unique nature of speech and the way speech can be attributed, even when corporate formalities are observed. And I think the right line of case law here is not just this court's decision in 2013 and AOSI, but also cases like Pleasant Grove City v. Samoom, Walker v. Texas Division Sons of Confederate Veterans, Pacific Gas and Electric, and as Justice Sotomayor mentioned, the Hurley Parade case. All of those cases recognize that legally separate entities or individuals and entities can have speech attributed from one to the other without engaging in any kind of veil-piercing or alter-ego analysis, which would get the court mired into the corporate formalities, which we don't advocate. Rather, we think a more limited holding based on the nature of speech and the First Amendment would suffice. On that score, what evidence is there that there is this risk of confusion or attribution, given that the domestic entity is free to disavow the statements of any foreign affiliates? It seems to me an empirical question. Do we have any empirics? Yeah, I think the best evidence is in the record in the unrebutted sworn declarations of these organizations, which talk about how they are perceived in the public health community, the price they are paying in the form of hypocrisy, and the way that they lose their integrity and their reputation and their brand when they're forced to speak out of two sides of their mouth. The declarations that were... I understand that harm, Kelson. I'm sorry to interrupt, but I understand the harm that people will see the disavowal and will take cognizance of it. But is that the same thing as anyone really thinking that the domestic entity abides by the government restrictions and endorses them? Anyone really think that when they read that? Or do they think that this is a statement made by a foreign entity in order to secure U.S. dollars that obviously the U.S. entity itself does not promote or agree with? Why wouldn't that be the natural reading by the average reader? Well, I think when these public health organizations take a pledge saying that they believe something, I think people take it very seriously. When they say that they believe that HIV-AIDS is transmitted in a certain way, or when they say they believe that prostitution should be dealt with in a way that stops the spread of the disease, people listen to them, the reason they're so effective in these programs. Counselor, I accept that again. That's not really quite my question. Couldn't a reasonable person hold in his or her mind two things? One, the foreign entity believes X. Two, the domestic entity does not believe X. Well, Your Honor, I think that falls apart when the organization speaks with one voice, as these organizations do. They have a right to speak that way. They have a right to join with their affiliates in having their common voice and their common mission. And when they're told to say one thing and then disavow it in another breath, I think it undercuts their reputation and brand and their own speech. I think Your Honor had it exactly right. Are we back then, Counsel, to the belief that people will always confuse this as one entity and it's not possible for a local chapter of an organization to have a different view than the national organization or the international organization, that people cannot hold that concept in their heads? Briefly, Counsel? Yes, briefly. I think the public doesn't know that these are separate corporations. The problem is they are indistinguishable and they look to the public to be exactly the same. And so it really would be more like Your Honor's case in Masterpiece Cake Shop, making the baker say one thing and then attempt to disavow it in the next breath. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Counsel. I want to clarify first one thing from your colloquy with Justice Ginsburg. You agree, I assume, that unaffiliated foreign entities acting abroad have no constitutional rights under this Court's precedents? We do, Your Honor. Okay. And then I want to pick up on Justice Alito's concern or question about the foreign policy effects of your approach, and I have a hypothetical as well. Suppose the U.S. government wants to fund foreign NGOs that support peace in the Middle East, but only if the NGOs explicitly recognize Israel as a legitimate state. Are you saying the U.S. can't impose that kind of speech restriction on foreign NGOs that are affiliated with U.S. organizations? I think that's a harder case because I don't hear that as requiring affirmation of a belief. Rather, it's in recognizing a fact that the U.S. has established a certain diplomatic relationship with Israel, and the U.S. government gets to say what that relationship is for the United States. I don't think that's making the entities espouse that view as their own, and so I think that's different. I think that would be acceptable. That would be acceptable in your view? I think it would be. Okay, and then the government says that your position would unleash foreign affiliates of U.S. corporations to pump money into the U.S. election process, and I wanted to give you a chance to respond to that claim, which was in the government's reply brief and then repeated here today. Yeah, I disagree with that. That's a very different case. That is a speech restriction. It is not speech compulsion, and that restriction doesn't apply to the U.S. organizations and so, and I think this court dealt with that the right way in Citizens United and distinguished the foreign organizations from the U.S. organizations, and it's a different case. Thank you, Counsel. One minute to wrap up, Mr. Boker. Thank you, Your Honor. Applying the policy requirement to foreign members of these tight-knit international entities fighting HIV AIDS overseas puts words in the mouths of the U.S. members of those entities, and the program regulations effectively prevent the U.S. members from even disavowing what the foreign members are compelled to say. The injunction should be upheld. Thank you, Counsel. Mr. Michel, three minutes for rebuttal. Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, to respond to Justice Sotomayor's question about facial invalidity, footnote one of our reply brief explains that the government's prior submission was clear that the statute was being challenged only with respect to domestic entities, and in fact, a true facial invalidation would invalidate the statute even as applied to foreign entities that have no connection to the United States, which I take it, my friend has just conceded, is not his position. Second, my friend stated that the U.S. entity truly is in control, and I think that's exactly right, but that ultimately underscores that it's the U.S. entity, the holder of the First Amendment rights, that is making a choice to affiliate with a foreign entity that accepts leadership-backed funds. Unlike in this case last time, and unlike in cases like Hurley and Masterpiece, the U.S. entity is not required to make that choice. The U.S. entity has a separate choice to accept leadership-backed funds itself and operate itself in foreign countries without any risk of hypocrisy or a mixed message. As Justice Gorsuch says, you have to take the sweet with the sour when you decide to set up a separate corporate entity. Now, my friend suggests that either U.S. funding conditions or foreign law somehow give an incentive for U.S. entities to use foreign affiliates, but they're not challenging any U.S. funding decisions, which would, we believe, be beyond a challenge anyway, and foreign law certainly cannot change the scope of a U.S. entity's First Amendment rights. My friend's position ultimately rests on what he frames as a risk of attribution test, but I think Judge Straub got it right below when he called that position startling. As Justice Kavanaugh and Justice Alito both, I think, alluded to, that test would be unworkable and it would call into question all manner of U.S. speech restrictions on foreign entities abroad. Now, my friend says there's a distinction between speech restrictions and speech compulsions, but the risk of attribution test that he has outlined, where you simply compare names, logos, and brands, has nothing to do with the distinction between speech attribution and speech compulsion, and in all events, the foreign entities here are only, if the U.S. entities choose, required to make the statement in a letter to USAID, not to shout it from the mountaintops and not to say anything that will ultimately interfere with the U.S. recipient's message. Finally, I wanna note, respondents never made this argument for more than a decade of the litigation. I think what happened is that having secured rights for U.S. entities, they decided to ask for the world, but there's no basis in this court's prior decision or any other source of law for that holding it would invalidate a provision that Congress has adopted and reauthorized, and that is working. The decision below should be reversed. Thank you, counsel. The case is submitted.